UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Brock Gaudreault,

        Plaintiff,

v.

Elite Line Services, LLC, a subsidiary of
G&T Conveyor Company, Inc., a Florida
company,

        Defendant.

No. 12-cv-1177 (JNE/JSM)
MEMORANDUM
AND ORDER

---

This is a personal injury case brought under Minnesota negligence law pursuant to the Court's diversity jurisdiction. The matter is now before the Court on the Defendant's *Daubert* Motion and Motion for Summary Judgment. ECF No. 36.

For the reasons discussed below, the motion is denied.

## **Background**

The facts that follow are undisputed. Plaintiff Brock Gaudreault is a former equipment service employee of Delta Air Lines. On May 23, 2010, Gaudreault was working on the tarmac at Minneapolis-St. Paul International Airport as an airplane was being directed to a gate. While Gaudreault was preparing to block the plane's tires, a ground power unit ("GPU") cord that was hanging from the jetway above him came loose and fell onto him, resulting in head and neck injuries.

The GPU is a piece of ground equipment that provides power to a plane while it is parked with its engines off. The GPU connects to the plane with a very large power cord that can weigh in excess of 150 pounds. When not in use, the cord can be strung from the side of the jetway by

a hanger assembly consisting of saddle clamps, carabiners, and u-bolts.  The cord can be hoisted up and down from this position by the ground crew as needed.

Soon after Gaudreault was injured, a Delta employee removed and photographed one of the saddle clamp, carabiner, and u-bolt assemblies from the GPU cord that had fallen from the jetway.  The photographs show that the u-bolt was deformed, with one of its stems bent away from the saddle clamp to which it had been affixed.  This damaged u-bolt has since disappeared.

Since the accident, Gaudreault has been receiving workers' compensation benefits from Delta.  In 2012, Gaudreault brought this action against Defendant Elite Line Services ("ELS").  ELS is a company that provides operation and maintenance services to airports and airlines.  At the time of accident, ELS had a contract to inspect and maintain Delta's ground equipment at MSP Airport, including the jetway under which Gaudreault was injured.  Gaudreault's amended complaint asserts a single count of negligence against ELS, alleging that its "negligence and carelessness were a direct and proximate cause of [his] injury by failing to properly inspect, maintain and repair the GPU, the u-bolt and the cables in violation of airline regulations."

ELS subsequently filed a third-party complaint against Delta, alleging that its negligence had caused Gaudreault's injury and asserting a right of contribution.  ELS also alleged that Delta was liable for spoliation of evidence because the u-bolt went missing while in its possession.  Delta moved to dismiss ELS's third-party complaint; the Court dismissed the spoliation claim, but denied the motion as it pertained to ELS's contribution claim.  Shortly thereafter, Delta and ELS filed a stipulation in which Delta waived its right of subrogation and ELS dismissed its contribution claim with prejudice.

Discovery has since been completed, and ELS has filed the motion that is currently before the Court.

<u>**Discussion**</u>

ELS's motion has three components: a *Daubert* motion seeking the exclusion of

Gaudreault's expert; a motion for summary judgment; and, in the alternative, a motion for partial

summary judgment.

These three motions are addressed in turn below.


I.      ***Daubert.***

ELS first moves to exclude Gaudreault's liability expert, Matthew Lykins.  Federal Rule

of Evidence 702 governs the testimony of expert witnesses.  Under that rule,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help
>      the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of
>      the case.

The rule thus charges the trial court with performing a "gatekeeping" function, whereby it must

"first . . . determin[e] whether the witness is qualified to offer expert testimony" and then ensure

that that testimony "is not only relevant, but reliable."  *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  *See also Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 142 (1999) (applying *Daubert* gatekeeping principles to expert testimony on non-

scientific "technical" or "other specialized" matters); *Lauzon v. Senco Products, Inc.*, 270 F.3d

681, 686 (8th Cir. 2001).

As with any evidence, the proponent of the proffered expert testimony "has the burden of

establishing that the pertinent admissibility requirements are met by a preponderance of the

evidence." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. *See Daubert*, 509 U.S. at 592 n.10. With that said, a court must be vigilant not to exclude an expert where the opponent's challenge to the proffered testimony "goes to the weight that the jury accords the testimony rather than to its admissibility." *Miles v. General Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001). *See also Lauzon*, 270 F.3d at 686 (noting that Rule 702 "reflects an attempt to liberalize the rules governing the admission of expert testimony" and "clearly is [a rule] of admissibility rather than exclusion") (internal quotations omitted). The gatekeeper need not be "overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Pursuant to these considerations, and as explained below, the Court concludes that ELS's challenges to Lykins' proffered testimony, while certainly fodder for adversary testing at trial, do not warrant his wholesale exclusion under Rule 702.

### A.  Qualifications.

First, Lykins must be "qualified as an expert by knowledge, skill, experience, training, or education" in the subject matter about which he seeks to testify. Fed. R. Evid. 702; *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 857-58 (8th Cir. 1975) ("The broad and generally stated test for determining the qualifications of a given witness to testify as an expert is whether his knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth.").

The parties disagree about whether Lykins' education and experience qualify him as an expert in the subject matter of his proposed testimony. In his report, Lykins addresses whether "the actions/inactions of [ELS] caused or contributed of [sic] Gaudreault's injury." Lykins concludes that they did, specifically opining that ELS "fail[ed] to adequately inspect and recommend appropriate maintenance/inspection intervals on the incident [jetway]" which would have "remediated the hazardous condition" posed by "the incident GPU cable saddle assembly."

ELS argues that Lykins is not qualified to offer this opinion because his education and experience lie in airframe (airplanes) and powerplant (airplane engines) maintenance, rather than in the maintenance of airport ground equipment like jetways and hanger assemblies for GPU cords. Gaudreault counters that the subject matter of Lykins' testimony is the inspection and maintenance of safety-critical components of mechanical systems used in the aviation industry, about which his knowledge, education, training, and experience qualify him to opine.

Gaudreault has the better of this argument. Lykins has an A.A. and a B.A. in Aviation Maintenance Technology, numerous FAA certifications, and nearly two decades of experience performing and teaching aviation maintenance. ELS is correct that Lykins has no particular experience maintaining jetways or hanger assemblies for GPU cords. But that, while a topic for cross-examination, is not disqualifying in these circumstances. This is not a case about the design, engineering, or operation of a jetway, and the hanger assembly – consisting of a carabiner attached to a u-bolt attached to a saddle clamp attached to a GPU cord – does not appear to be a piece of high technology. Lykins' proffered testimony focuses on principles of preventive maintenance, including the identification of safety-critical components in a piece of mechanical equipment, the recognition of potential hazards posed by those components falling into disrepair, and the development and implementation of inspection protocols to identify and

eliminate those risks.  Knowledge of these principles and the skills to apply them to the mechanical systems commonly used in the aviation industry, including the GPU cord hanger assembly, are well within the scope of Lykins' expertise.

Rule 702 requires only that an expert's "experience . . . bear a close relationship to [his] opinion"; it does not require an airtight fit.  *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009).  *See also Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81-82 (2nd Cir. 1997) ("In determining whether an expert is sufficiently knowledgeable to be admitted to testify, one of the factors that the district court ought to consider is whether other experts exist who are more specifically qualified and who are nonetheless not in the employ of the company . . . whose practices are being challenged. . . . [W]here . . . well-trained people with somewhat more general qualifications are available, it is error to exclude them.").  The Court therefore concludes that Lykins qualifies as an expert in the subject matter about which he proposes to testify.

### B.  Relevance.

Second, even if Lykins is qualified as a subject matter expert, his proffered testimony must also be relevant.  "Rule 702 requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'  This condition goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (internal quotation omitted).

The Court readily concludes that Lykins' proffered testimony meets the standard of relevancy.  Lykins' testimony will assist the jury in understanding the roles and responsibilities of inspection and maintenance providers in the aviation industry, and his opinion that ELS's performance fell short with respect to the equipment involved in the accident that injured

Gaudreault is directly relevant to the breach and causation elements of the negligence claim (which are discussed in Section II below).

### C.  Reliability.

The third and final requirement of Rule 702 is that Lykins' testimony be reliable.  The focus of a gatekeeping inquiry into the reliability of expert testimony "must be solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 594-95.

ELS argues that Lykins' proffered testimony is unreliable for three reasons: his opinions are grounded in assumptions rather fact; he does not utilize objective standards and methods; and he does not explain the physical force that deformed the u-bolt, resulting in the GPU cord falling from the hanger assembly onto Gaudreault below.

It is true that an expert's testimony should be excluded where his opinion is inadequately grounded in facts, principles, and valid methods.  The Eighth Circuit, channeling *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), has put it bluntly: "Speculative testimony should not be admitted. . . . In deciding to exclude expert testimony, 'a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'"  *Junk v. Terminix Intern. Co.*, 628 F.3d 439, 448 (8th Cir. 2010) (internal citation omitted).

But that is not the case here.  Lykins' opinions are based in the principles and methods that he knows from his experience to guide inspection and maintenance providers in the aviation industry, including standard practices for conducting hazard analyses, communicating and acting on their results, and documenting the repair of safety-critical components.  *See U.S. v. Holmes*, --- F.3d ----, Nos. 13-1660, 13-1661, 2014 WL 1876127, at *4 (8th Cir. May 12, 2014) ("Expert testimony must rest on reliable principles and methods, but the 'relevant reliability concerns may

7

focus upon personal knowledge or experience' rather than scientific foundations.") (quoting *Kumho Tire*, 526 U.S. at 150).  Furthermore, Lykins applies those principles and methods to the facts and circumstances surrounding Gaudreault's accident, such as the function to which the u-bolt was put in the hoist, the frequency with which ELS had to replace other u-bolts that were put to the same or similar use, the lack of documentation of those repairs, and the absence of a hazard analysis or communication with Delta regarding the failing u-bolts.

In this respect, Lykins' refusal to stake out a position as to the nature of the physical force that caused this particular u-bolt to deform is inconsequential.  Lykins acknowledges the competing accounts of how the u-bolt in question may have been damaged, and opines that ELS was obligated by its specific contract with Delta and by its overarching responsibilities as an inspection and maintenance provider to have taken certain actions that would have prevented the accident regardless of which of these scenarios actually occurred.  ELS's challenge to that conclusion is appropriately pursued at trial.

Because Lykins' opinions are adequately grounded in facts, principles, and methods, his proffered testimony meets the reliability standard embedded in Rule 702.  ELS's *Daubert* motion is therefore denied.

## II.     Summary judgment.

ELS next moves for summary judgment on Gaudreault's negligence claim.  In Minnesota, the elements of a negligence claim are "(1) the existence of a duty of care; (2) breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury."  *Doe 169 v. Brandon*, --- N.W.2d ----, 2014 WL 1385341, at *3 (Minn. 2014) (quoting *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995)).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact either cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). In addition, in determining whether summary judgment is appropriate, a court must view the record and any inferences that may reasonably be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Here, ELS premises its summary judgment motion on the success of its *Daubert* motion, arguing that that it is entitled to summary judgment because "[w]ithout Mr. Lykins's testimony, the plaintiff has insufficient proof of duty, breach, and (particularly) causation." With the *Daubert* motion having been denied, ELS's summary judgment argument is left lacking. Furthermore, as explained below, Gaudreault has made a sufficient showing such that the motion must be denied.

### A.  Duty.

The first element of a negligence claim is that the defendant must owe a duty of care. In Minnesota,

> the duty to exercise reasonable care arises from the probability or foreseeability of injury to the plaintiff. . . . In other words, when a person acts in some manner that creates a foreseeable risk of injury to another, the actor is charged with an affirmative duty to exercise reasonable care to prevent his conduct from harming others.

*Domagala v. Rolland*, 805 N.W.2d 14, 26 (Minn. 2011) (citations omitted).  The existence of a duty of care is for the court to decide in all but "close cases."  *Id.* at 27.

When it comes to the existence of legal duty, this is not a close case.  "To determine whether an injury was foreseeable, [the court] look[s] to the defendant's conduct and ask[s] whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury." *Id.*  The Minnesota Supreme Court has been clear that "the test is not whether the precise nature and manner of the plaintiff's injury was foreseeable, but whether the possibility of an accident was clear to the person of ordinary prudence."  *Id.  See Mack v. Stryker Corp.*, --- F.3d ----, No. 12-3130, 2014 WL 1876124, *3 (8th Cir. May 12, 2014) (citing and applying *Domagala*'s articulation of duty and foreseeability).

It is evident that a person of ordinary prudence would expect that failing to properly inspect and maintain airport ground equipment – in particular the hanger assemblies that hold heavy GPU power cords in the air over the heads of the ground crew working below – presents a danger and could result in physical injury to those who work with and in proximity to the equipment.  Thus, even if an injury to a member of the ground crew resulting from a failing u-bolt was unprecedented, it was not unforeseeable.

Furthermore, Minnesota has adopted the principle stated in § 324A of the Restatement (Second) of Torts (1965) that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

10

*See, e.g., Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165 (Minn. 1989); *Walsh v. Pagra Air Taxi, Inc.,* 282 N.W.2d 567, 570–71 (Minn. 1979).  In this case, ELS, through its contract with Delta, undertook for consideration the responsibility to inspect and maintain Delta's ground equipment at MSP Airport.  Amelioration of the risks posed by damage to that equipment was necessary for the protection of the Delta employees who worked with and around the equipment and was therefore encompassed by Delta's overarching responsibility to maintain a safe workplace for its employees.  *See Stringer v. Minnesota Vikings Football Club, LLC*, 705 N.W.2d 746, 756 (Minn. 2005) ("[T]he duty to provide employees with a safe workplace is a nondelegable duty held by the employer.") (citation omitted).

Thus, by undertaking to provide certain inspection and maintenance services for Delta, ELS owed a duty to perform those services with the degree of care that a reasonably prudent professional inspection and maintenance provider in the aviation industry would use, so as "to prevent injury to others as a result of [its] conduct."  *Domagala*, 805 N.W.2d at 28; *Erickson*, 447 N.W.2d at 171.  This duty is distinct from and in addition to that owed by Delta to its employees, and is also separate from any liability in contract ELS may or may not have to Delta.  *See* Restatement (Third) of Torts – Phys. & Emot. Harm § 43[1] cmts. g-h (2012) ("The actor who engages in an undertaking need not completely displace the person originally owing the duty. Thus, a safety-inspection service hired to supplement an employer's efforts to provide a safe workplace for its employees is subject to a duty under this Section. . . . The duty imposed by this Section is independent of any contractual obligations.  The duty of reasonable care imposed by this Section . . . exists regardless of whether there is a contract, whether a claim for breach of contract is available, or whether the plaintiff is a third-party beneficiary of the contract.  The

---

[1]     Section 43 of the Restatement (Third) of Torts – Physical and Emotional Harm is the successor to § 324A of the Restatement (Second) of Torts.

terms of a contract may be relevant to the existence and scope of an undertaking, but they do not determine whether a duty exists.").

### B. Breach.

The second element of a negligence claim is that the defendant breached its duty to use reasonable care.  Minnesota law on breach "[d]raw[s] on the principle that the care exercised must adequately remedy the harm foreseeable from the defendant's conduct . . . ."  *Domagala*, 805 N.W.2d at 28.  Therefore, while "the reasonable care standard itself does not vary based on the defendant's conduct, . . . the degree of care required to satisfy that standard does change based on the circumstances presented to the parties."  *Id.*  In other words, "[w]hat constitutes reasonable care will . . . vary with the surrounding circumstances and will involve a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm."  *Bilotta v. Kelley Co.,* 346 N.W.2d 616, 621 (Minn.1984) (quoting *Holm v. Sponco,* 324 N.W.2d 207, 212 (Minn.1982)).

Here, there is a clear dispute as to whether ELS acted with the requisite degree of care. Though not discussed in this way by the parties, their dispute over breach must start with the nature and scope of the services ELS undertook to provide with respect to the inspection and maintenance of the GPU cord hanger assemblies through its contract with Delta.  Gaudreault does not claim that the particular u-bolt at issue was damaged prior to the last routine inspection of the hanger assembly, such that ELS could have been negligent for failing to notice the damage and replace the affected part.  Nor does Gaudreault claim that anyone at Delta ever requested that ELS replace the u-bolt at issue prior to the accident, but ELS failed to respond.  Rather, Gaudreault faults ELS – as does Lykins – for failing to take additional steps beyond the routine,

periodic inspections to identify and remedy the hazards posed by the use of u-bolts in the hanger assemblies, as they allegedly had to be repaired very frequently.  But ELS could not be found to have breached a duty to use reasonable care in detecting, diagnosing, and preventing these u-bolt failures unless it undertook to provide that type of preventive service for Delta; if it did not, that responsibility would have remained with Delta.

ELS does emphasize its position that it inspected the jetway under which Gaudreault was injured in accordance with its contract with Delta.  Gaudreault, for his part, disputes ELS's assertion that it satisfactorily performed its contractual duties with respect to the hanger assemblies, pointing to several provisions of Exhibit A to the contract (entitled "Services to be Performed") that required ELS to "perform preventative . . . maintenance," "[p]rovide written notification of any safety issues with recommendations for immediate repair," "[r]eport avoidable damage in writing," and "[c]ommunicate any issues or concerns to station management."  But whether by this language, ELS agreed to proactively detect, analyze, and remediate the *causes* of u-bolt failures – rather than simply to replace already damaged u-bolts as identified and called in by Delta employees and to periodically inspect the hanger assemblies on a schedule set by Delta – is a question of contract interpretation that the parties have thus far addressed only peripherally.

With the vagueness and broadness of the contractual language – that ELS is to provide "preventative maintenance" and notify Delta in writing of "avoidable damage" and "any safety issues" – the Court cannot say as a matter of law that ELS did not undertake to provide the sort of proactive investigatory and remediation services that are central to Gaudreault's theory of ELS's negligence. *See Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 346 (Minn. 2003) ("The construction and effect of a contract is . . . a question of law unless the contract is

ambiguous."); 11 Richard A. Lord, *Williston on Contracts* § 30:4 (4th ed. 2009) ("[A]n ambiguous contract is an agreement which is obscure in its meaning, because of indefiniteness of expression, as where the contract employs a critical term which is not defined or there are terms missing, or because a double meaning is present.").  As these contract provisions are made ambiguous by their indefiniteness, their meaning is a matter for a jury to decide.  *Cherne Contracting Corp. v. Marathon Petroleum Co., LLC*, 578 F.3d 735, 740 (8th Cir. 2009).

Furthermore, while the contract triggered for ELS a duty to use reasonable care in the services it undertook to provide – whatever a jury may determine the nature and scope of those services to be – that contract does not itself define the standard of reasonable care such that ELS would be entitled to summary judgment on proof that Delta believed that ELS satisfied the contract.  *See Erickson*, 447 N.W.2d at 165 (denying summary judgment on breach element where defendant fulfilled its contract with owner of parking ramp to provide security services, but factual dispute remained as to whether security guard had exercised reasonable care when he failed to stop assault of plaintiff in the ramp).  ELS's legal duty in providing the inspection and maintenance services it undertook was to prevent foreseeable harm to foreseeable plaintiffs, which could be quite different from ELS's contractual duty to Delta.  And because ELS utilized specialized skills or knowledge in rendering those services, "these skills or knowledge are circumstances to be taken into account in determining whether the actor has behaved as a reasonably careful person."  Restatement (Third) of Torts – Phys. & Emot. Harm § 12 (2012).

Relevant again, then, is the information in the record, discussed above in relation to Lykins' testimony, regarding the function to which the u-bolt was put in the hoist, the frequency with which ELS replaced other u-bolts that were put to the same or similar use, the lack of documentation of those repairs, and the absence of a hazard analysis or communication with

Delta regarding the failing u-bolts.  Construed in the light most favorable to Gaudreault, these facts and circumstances could reasonably support the conclusion that ELS was obligated to – but did not – take steps to determine the reason or reasons why the u-bolts failed with such regularity and to ameliorate the danger those failures posed to the ground crew.

The question of whether ELS breached its duty to act with reasonable care must therefore be submitted to and decided by a jury.

**C.  Proximate cause.**

The final element of negligence put in issue by ELS's motion is that the defendant's breach of its duty to use reasonable care must be the proximate cause of the plaintiff's injury. The Minnesota Supreme Court has explained this causation element as follows:

> Minnesota applies the substantial factor test for causation.  The negligent act is a direct, or proximate, cause of harm if the act was a substantial factor in the harm's occurrence. . . . Factual, or but-for, causation is insufficient to establish liability in Minnesota because in a philosophical sense, the causes of an accident go back to the birth of the parties and the discovery of America. . . .  But-for causation, however, is still necessary for substantial factor causation because if the harm would have occurred even without the negligent act, the act could not have been a substantial factor in bringing about the harm. . . . The classic test for determining factual cause is to compare what actually happened with a hypothetical situation identical to what actually happened but without the negligent act.

*George v. Estate of Baker*, 724 N.W.2d 1, 10-11 (Minn. 2006) (quotation and citations omitted).

Here, ELS again faults Gaudreault for failing to take a strong position on the particular manner in which the u-bolt that gave way in the accident was deformed.  Without that, ELS contends, Gaudreault cannot prove that ELS could have identified and ameliorated the danger it posed through a hazard analysis or a more robust inspection program.  (For its part, ELS notes that its expert, Dr. Jeffrey Pfaendtner, contends that the u-bolt was deformed by "overload.")

However, Gaudreault has identified deposition testimony in which witnesses do offer an account of how this particular u-bolt was damaged as well as a different, albeit not necessarily inconsistent, account of how GPU cords were generally handled on the tarmac.  First, Rob Decker, a ground service equipment manager for Delta, concluded that the accident occurred because the GPU cord had become tangled on itself "like a garden hose" as it lay on the ground during its most recent use, such that when it was hoisted up to the jetway, the lack of slack in the cord created sufficient tension to bend the u-bolt.  (Decker also later suggested that the GPU cord may have become wrapped or tangled around a bollard (concrete safety pillar) during its most recent use; whether Decker intends this as an alternative to the "garden hose" scenario, or simply as a further explanation of it, is unclear from his deposition testimony.)  Decker, who was not present when Gaudreault was injured but investigated the events afterward, testified that he based his conclusion in large part on his discussions with Tracy Larson, the ELS maintenance employee who repaired the damaged hanger assembly after the accident.  According to Decker's deposition, Larson reported to him that he had seen in the aftermath of the accident "that there was a loop in the ground power cable that actually made it too short to be fully raised up to the full height of the cable hoist."

Second, speaking to his experience generally with GPU cord hanger assemblies, Larson himself testified that he had replaced 400-500 u-bolts in his career besides the one involved in Gaudreault's accident.  According to Larson, these other u-bolts generally broke because of "[a]buse mostly, getting caught on things, stretching them," and he had seen GPU cords be left on the ground and run over by vehicles on the tarmac.  Ryan Ludwig, another ELS maintenance employee at the time of the accident, similarly testified that he had had to "change[] numerous saddle clamps" because "[e]ither they ran over it and it got bent or they were worn."  Finally,

16

Scott Arms, a third ELS employee at the time, concurred that the GPU cords were often "left on the ground . . . [a]nd the saddle clamp and the U-bolts are drug around, damaged, run over."

This evidence provides a sufficient basis, beyond "mere speculation, conjecture, or fantasy," *Putman v. Unity Health System*, 348 F.3d 732, 734 (8th Cir. 2003) (quotation omitted), for a jury to find that ELS could have anticipated and taken action to prevent this particular u-bolt from being damaged, such that its failure to do so was a substantial factor in the occurrence of the accident. There is no indication that the events that took place on the tarmac immediately prior to the accident were in any way unique or inconsistent with the regular use of the GPU cord and hoist by the ground crew at MSP Airport.

In these circumstances, where ELS could be found to have undertaken by contract to detect and prevent the causes of damage to Delta's ground equipment – which necessarily include human acts by the ground crew– it would be anomalous to conclude that ELS is entitled to summary judgment because one or more of those human acts may have taken place. *See* Restatement (Third) of Torts – Phys. & Emot. Harm § 34 cmt. d (2012) ("In some instances, the risks posed by . . . a culpable (or, a fortiori, nonculpable) human act may be precisely the risks that render tortious an actor's failure to adopt adequate precautions."). Of course, it may still be shown that the force that deformed the u-bolt could not have been reasonably foreseen by ELS, such that it constitutes a superseding cause that breaks the chain of causation between any breach by ELS of its duty to use reasonable care and Gaudreault's injury. *See, e.g., Canada v. McCarthy*, 567 N.W.2d 496, 507 (Minn. 1997) (discussing elements of superseding cause). But on this record, whether it does or not is a question for a jury, not the Court, to decide.

### III.   Partial summary judgment.

For its third and final motion, ELS requests an "order granting partial summary judgment finding that, unless ELS is found to be more than 50% at fault, it cannot be held jointly and severally liable for fault attributable to Delta Airlines [sic]."  ELS's motion is, in essence, a request for clarification about the intersection of Minnesota law on joint and several liability with the no-fault workers' compensation scheme.

The Federal Rules of Civil Procedure provide no basis for granting partial summary judgment on a hypothetical question of this sort, *see* Fed. R. Civ. P. 56(a) (providing for summary judgment on "part of [a] claim or defense" where there is no genuine dispute as to any material fact), and so ELS's motion must therefore be denied.  Nevertheless, as Gaudreault has not objected to ELS's presentation of the question here –  and in fact the parties have fully briefed and argued it – the Court sees no reason to defer addressing an issue that the parties have indicated will be relevant to the resolution of the case.

At its core, the disagreement is about the scope of a 2003 amendment to Minnesota's Comparative Fault Act.  The relevant portion of that amendment is codified at Minn. Stat. § 604.02, subd. 1, which now reads as follows:

> When two or more persons are severally liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that the following persons are jointly and severally liable for the whole award:
>
> (1) a person whose fault is greater than 50 percent . . . .

Gaudreault argues that the statute does not apply to his cases.  According to Gaudreault, the Minnesota courts have established that "joint and several liability concepts are inapplicable to *Lambertson* cases" – in other words, negligence cases brought by a plaintiff-employee against a third-party tortfeasor who requests that the jury also assess the fault of the non-party employer.

Gaudreault's position is not tenable.  In *Lambertson v. Cincinnati Welding Corp.*, the Minnesota Supreme Court grappled with a "controversy result[ing] from conflicts among the policies underlying workers' compensation, contribution/indemnity, and comparative negligence and the fault concept of tort recovery."  257 N.W.2d 679, 684 (Minn. 1977).  The significance of *Lambertson* cannot be separated from its circumstances: the case was decided in 1977, at a time when Minnesota was a pure joint and several liability state and when the workers' compensation statute was silent on a third-party tortfeasor's right of contribution from the employer.  *Id*. at 686 (quoting precursor of Minn. Stat. § 604.02, subd. 1, which then stated without qualification that "[w]hen there are two or more persons who are jointly liable, contributions to awards shall be in proportion to the percentage of negligence attributable to each, provided, however, that each shall remain jointly and severally liable for the whole award").

In that environment, a special verdict finding the third-party tortfeasor and the employer to each bear a share of fault for the plaintiff's injury presented a conundrum for the courts:

> If contribution or indemnity is allowed, the employer may be forced to pay his employee through the conduit of the third-party tortfeasor an amount in excess of his statutory workers' compensation liability. . . . If contribution or indemnity is not allowed, a third-party stranger to the workers' compensation system is made to bear the burden of a full common-law judgment despite possibly greater fault on the part of the employer.

*Id.* at 684.  The so-called "*Lambertson* compromise," then, was to take a middle way: contribution from the employer to the third-party tortfeasor would be allowed "up to the amount of the workers' compensation benefits."  *Id.* at 689.  The Minnesota Supreme Court explicitly considered this to be "the solution . . . most consistent with fairness and the various statutory schemes before us" – including, of course, the joint and several liability statute.  *Id.*

Gaudreault insists that the correct procedure for apportionment in this type of case

remains the one the Minnesota Supreme Court applied in *Johnson v. Raske Building Systems, Inc*.:

> The third-party tortfeasors . . . should pay the entire verdict . . . to the plaintiff. The employer should then contribute to the third-party tortfeasor an amount proportionate to its percentage of negligence, but not to exceed the amount of workers' compensation benefits payable to the employee . . . . The employee . . . should then reimburse the employer pursuant to s 176.061, subd. 6(c).

276 N.W.2d 79, 81 (Minn. 1979).  However, like *Lambertson*, *Johnson* cannot be read in isolation from the statutory background against which it was issued.  In fact, *Johnson*, a 1979 decision, is merely an application of the *Lambertson* rule to a particular verdict.  *Id.* at 80 ("The sole issue on appeal is the appropriate apportionment of . . . damages among the parties.  Where the employer who has paid workers' compensation benefits and a third party are both negligent, he apportionment of damages is controlled by Minn.St. 176.061, subd. 6, and our decision in *Lambertson* . . . .").

   The statutory schemes that underlie the *Lambertson* compromise and the *Johnson* apportionment procedure have changed in at least two ways that are relevant to this case.  First, in 2000, the Minnesota Legislature amended the third-party liability section of the workers' compensation statute at Minn. Stat. § 176.061 by adding subdivision 11, which states:

> To the extent the employer has fault, separate from the fault of the injured employee to whom workers' compensation benefits are payable, any nonemployer third party who is liable has a right of contribution against the employer in an amount proportional to the employer's percentage of fault but not to exceed the net amount the employer recovered pursuant to subdivision 6, paragraphs (b) and (c).  The employer may avoid contribution exposure by affirmatively waiving, before selection of the jury, the right to recover workers' compensation benefits paid and payable, thus removing compensation benefits from the damages payable by any third party.
>
> Procedurally, if the employer waives or settles the right to recover workers' compensation benefits paid and payable, the employee or the employee's dependents have the option to present all common law or wrongful death damages whether they are recoverable under the Workers' Compensation Act or not.

> Following the verdict, the trial court will deduct any awarded damages that are duplicative of workers' compensation benefits paid or payable.

This "waive and walk" procedure thus modifies the *Lambertson* and *Johnson* approach by providing an avenue for an employer to extricate itself from any involvement in the payment of an award. Where a waiver has been executed, as it has been in this case by Delta, the plain terms of subd. 11 override the *Johnson* apportionment procedure.

Second, to return to where this discussion started, the Minnesota Legislature amended the Comparative Fault Act in 2003. Under the current version of the statute, "when two or more persons are severally liable" for the plaintiff's injury, a person is jointly and severally liable for the entire award only if it bears more than 50% of the fault. Gaudreault argues that this statute does not apply to this case because Delta, as an employer who is covered by the no-fault workers' compensation scheme, cannot be "severally liable" in tort for its employee's injury.

This is not persuasive. The Minnesota Supreme Court has long been clear that "[i]t is established without doubt that, when apportioning negligence, a jury must have the opportunity to consider the negligence of all parties to the transaction, whether or not they be parties to the lawsuit and whether or not they can be liable to the plaintiff or to the other tort-feasors either by operation of law or because of a prior release." *Lines v. Ryan*, 272 N.W.2d 896, 902-903 (Minn. 1978) (quotation omitted).

Furthermore, in the 2012 case of *Staab v. Diocese of St. Cloud*, the Minnesota Supreme Court considered the concept of "several liability" as it appears in the 2003 amendment:

> Under Minnesota common law, "persons are . . . liable" at the instant those persons' acts cause injury to a victim[, and] "two or more persons are severally liable" at the instant multiple tortfeasors commit an act that causes a single, indivisible injury to a plaintiff. . . .

> Section 604.02 does not express an intent to modify the common law meaning of "several liability" . . . . Additionally, the statute does not express an intent to

modify the common law rule that liability is created at the time a tort is committed. . . .

We conclude that whether "two or more persons are severally liable" for purposes of section 604.02, subdivision 1, is determined at the time the tort was committed and not at the time of judgment in a civil action arising from the tort. The predicate to this interpretation is that the Legislature did not modify the common law rule that liability is created at the moment a tort is committed, and therefore the statute incorporates the common law rule.

813 N.W.2d 68, 73-75, 77 (Minn. 2012) (quotation, citations, and footnote omitted).

After *Staab*, it is beyond dispute that "a tortfeasor's *liability* – whether joint, several, or both – arises and exists independently of the tortfeasor's participation in a lawsuit and, therefore, is independent of the tortfeasor's obligation to contribute to any judgment entered in such a lawsuit." *Id.* at 76.  That Delta has no exposure in tort to Gaudreault by operation of the Workers' Compensation Act is thus no barrier to the application of Minn. Stat. § 604.02, subd. 1 to a special verdict in this case.  To the extent *Decker v. Brunkow*, 557 N.W.2d 360, a 1996 decision from the Minnesota Court of Appeals, says otherwise, it is neither controlling nor persuasive.

Therefore, if the jury were to find that ELS and Delta each bear a share of the fault for bringing about an indivisible injury to Gaudreault, ELS will be jointly and severally liable for paying the entire award – less any portion of fault that may be assigned to Gaudreault and less any workers' compensation benefits paid and payable to Gaudreault by Delta that are duplicative – only if ELS is found to be more than 50% at fault.

Based on the files, records, and proceedings herein, and for the reasons discussed above,

IT IS ORDERED THAT:

1.  Defendant's *Daubert* Motion and Motion for Summary Judgment [ECF No. 36] is

    DENIED.


Dated: May 21, 2014                          s/Joan N. Ericksen
                                             JOAN N. ERICKSEN
                                             United States District Judge